J. ED. COSTELLO, APPELLANT, v. J. DALE ASHFORD, DEFENDANT, EQUITABLE LIFE INSURANCE COMPANY OF IOWA, RESPONDENT.—58 S. W. (2d) 755.

Kansas City Court of Appeals. April 3, 1933.

*Ford & Wright* for appellant.

*F. P. Stapleton* for respondent.

SHAIN, P. J.—This is an action to recover a balance on cash rent on a farm in Nodaway County, Missouri.

J. Ed Costello as plaintiff below, appellant herein, commenced the action against J. Dale Ashford, defendant below. Ashford, in his answer, admitted the debt but further set up the plea that the rent money was claimed by the Equitable Life Insurance Company of Iowa, a corporation, and Ashford asked that he be permitted to pay the money into court and further asked an order that the Insurance Company interplead. By permission of the court the amount of $442 was paid into the court and an order was made and thereafter the Equitable Life Insurance Company of Iowa, respondent herein, duly filed its interplea and the issue, under the interplea, was tried before the court, jury being waived, and by the judgment of the court the money was awarded to the Insurance Company. From this judgment, Costello appealed and the cause is duly before this court for review.

The facts are that Costello, hereinafter referred to as appellant, owned a large farm in Nodaway County, Missouri. On this farm he secured a loan from the Equitable Life Insurance Company of Iowa, hereinafter referred to as respondent. The amount of this loan was $18,000 and to secure same the plaintiff had duly executed a deed of trust on his aforesaid farm.

The plaintiff, after the execution of the trust deed, rented the farm to the defendant, Ashford, for crop rent and for cash rent in the amount of $642, payment deferred.

864

Thereafter, the plaintiff became in default and to secure an extension of time executed "as additional security" an assignment of the rental lease to the respondent.

Thereafter, the plaintiff made further default and the respondent began foreclosure proceedings under the deed of trust. During the pendency of the foreclosure proceedings there is shown negotiations between the plaintiff and the agents of the respondent looking to an adjustment whereby the plaintiff could save his farm. The plaintiff failing in his plans foreclosure was had by sale of the farm on February 6, 1932. At this sale, the respondent bid the full amount computed as due from the plaintiff to the respondent.

The question here involved is as to the agreement, if any, had between the plaintiff and the respondent prior to the sale concerning the rent money. The respondent contends that there was an understanding had with the plaintiff, wherein their bidding of the whole amount of the debt was based upon an agreement with the plaintiff that the respondent was to receive the balance of cash rent due from the defendant, Ashford. It appears that $200 had been paid prior to foreclosure and duly credited on the debt, leaving a balance of $442. The plaintiff contends that there was no such agreement as above, and that as the entire debt was wiped out when the respondent purchased the farm on a bid equaling the full amount of the debt, that he is entitled to receive the rent money.

It stands undisputed, that the original assignment of the rent was for additional security. The issue, therefore, rests entirely upon the fact as to whether or not there was an inforcible agreement entered into between the plaintiff and the respondent to the effect that the respondent should receive the rent in consideration of bidding the full amount of the debt.

The trial judge decided that there was shown, by the evidence, such an agreement and upon such finding gave judgment for the respondent. It follows, that as the trial was by the judge, jury being waived, if there be any facts and circumstances in evidence from which such an agreement can reasonably be inferred, then it is our duty to uphold the judgment.

The positive testimony of the plaintiff is that no agreement, touching the rent money going to the respondent in consideration of its bid, was ever entered into.

The respondent placed upon the stand two witnesses, C. W. Spence and Paul Sisson, loan agents for the company, with whom the plaintiff had negotiated with concerning the matter of foreclosure.

The most direct and positive statement by the witness, C. W. Spence, as to the question of the agreement in issue is shown by two questions and answers to-wit:

"Q. Then did the Equitable proceed to go to the sale and bid the farm in for the full amount? A. Yes, sir.

"Q. Was any question there raised by Mr. Costello as to what would happen to the rents at all if you didn't bid the full price? A. No, sir."

During the examination of witness, C. W. Spence, this colloquy took place between the court and counsel for the respondent:

"THE COURT: Well, if by reason of some consideration that you received, you had agreed to do that, then you would have to do it, but I haven't seen anything yet that indicates any binding agreement to do that.

"COUNSEL FOR INTERPLEADER: Well, that is just what the facts are, if the court please.

"THE COURT: Of course, it is stated here, that he had just told him they would bid it in. I don't see that binds them to do it; as a matter of law, I don't think they were required to do it. Do you think so?

"COUNSEL FOR INTERPLEADER: Well, I don't know that they would be bound to do it."

In the course of the examination of witness Sisson, these questions prior to the morning of February 6th, the date of the sale,

"Q. Well, tell the court what conversations were had between the three of you in regard to this foreclosure? A. The conversations prior to the morning of February 6th, the date of the sale, were generally in regard to his ability to pay the mortgage and to pay the arrearages. The morning of February 6th, Mr. Costello was in the office, and he and Mr. Spence talked together a great deal of the morning. I recall that I figured up the amount of the loan, what it would be *in toto*, that was the principal and interest and expenses of the foreclosure, taxes for 1929, which we paid October, '31, which we paid after taking a chattel mortgage, and I gave them those figures, and I think that was about all the conversation I had that morning.

"Q. Do you know what the total of those figures were? A. $21,296.53.

"Q. Now, Mr. Costello has made some reference here to the eight per cent proposition that you wanted to have figured, you remember that conversation about the eight per cent and five and a half per cent, when that occurred? A. In my opinion, that conversation occurred that morning, February 6th, when I gave him the figures of what the loan amounted to. I had to figure according to a contract. He gave us to understand that morning that he could go no further so his purpose in figuring the five and a half per cent interest had nothing to do with the case.

"Q. Now, did you have any discussion with Mr. Costello, either in the presence of Mr. Spence, or otherwise, as to the amount the

Equitable intended to bid at that sale that afternoon? A. Yes, sir.

"Q. When was that? A. Mr. Costello came up in the afternoon, and he and Mr. Spence were in the office just before we came over to the courthouse. I went back to where they were, and I says, 'Ed, I understand the company wished to treat you nice in this matter, and we will bid the full amount of the loan.' I said, 'isn't that right, Clarence' And Clarence nodded his head yes.

"THE COURT: Who is Clarence? A. Mr. Spence. Mr. Costello took all the figures down, had them itemized, and attended the sale.

"Q. Anything said at all about the rents at that time in your presence? A. Not at that time.

"Q. Had you heard any discussion of the rents between Mr. Spence and Mr. Costello previous to that time? A. I do no recall.

"Q. Or had you had any yourself with Mr. Costello in regard to these rents? A. I do not recall in regard to the foreclosure.

"Q. Now, Mr. Sisson, when did the question of Mr. Costello's claim for these rents first come up, so far as you know? A. It was either the next day or the second day after the sale he appeared in the office and wished to know what was my understanding about the rents?

"Q. What did you tell him? A. I told him the rents were coming to the company."

It is shown that the court had witness Spence recalled for further interrogation concerning a conversation had between the witness and the plaintiff concerning the assignment of the rent lease. This was a conversation that occurred before the sale.

Concerning such conversations occurring before foreclosure and at a time, as is shown, before the $200 payment was made, the witness Spence had given testimony as follows:

"Q. Now, Mr. Spence, after this assignment was made did the question of immediate action, that is either payment or foreclosure of this farm come up? A. Yes, sir.

"Q. After it did come up, did you have any conversation with Mr. Costello in regard to the rent of this farm? A. Yes, sir.

"Q. Could you tell the court whether that was before or after the $200 had been paid, if you remember? A. Not after, certainly.

"Q. Well, just go ahead and state what that conversation was in regard to these rents, Mr. Spence? A. We had numerous conversations regarding these rents, and at one time in Mr. Sisson's office, Mr. Costello asked, "Well, will I not get any of the rents?' And I said, 'No, they are already assigned.'

"Q. To the Equitable? A. Yes, sir.

"Q. Was anything said by Mr. Costello as negative to the proposition or objecting to it in any way? A. No, sir.

"Q. Now, Mr. Spence, did you frequently have discussions here with Mr. Costello about the foreclosure of this farm? A. Yes, sir.

"Q. Were you in Maryville along about that time more or less frequently? A. Yes, sir.

"Q. What was Mr. Costello trying to do, if anything, in regard to the sale of his farm? A. I think he was trying to sell it or dispose of it.

"Q. Now, sometime before the actual foreclosure, or the day of the sale, did you have any conversation with him in regard to the amount that was to be bid on the farm and in regard to a deed, and if so, when was it in reference to the sale? A. I can't give you the time, but there was never anything specific as to bidding it in for the full amount. He asked us to do that, and we did bid it in for the full amount."

When recalled, the following occurred:

"THE COURT: If I understood you correctly, Mr. Spence, in the course of your testimony you stated that sometime when you were having a conversation with Mr. Costello that he asked you or inquired if he would get any rents. and you told him no? A. Yes, sir.

"THE COURT: I wish you would give us the whole conversation that we might determine what you were discussing at that time. A. It is very difficult for me to give a *verbatim* statement that happened months ago, but I will give you the best I can, and that was this: that he had assigned us this lease and I considered that it was the property of the company, put up as collateral for a certain performance to pay the taxes and interest. He went out to the tenant to try to get him to pay some of this before it was due, and the tenant wouldn't do it.

"THE COURT: What led up to the question of his as to whether he would get any of the rents? A. I think it was a collection, trying to collect this before it was due."

The courts of this State have often held, as in Boone County Lumber Company v. F. W. Niedermeyer, 187 Mo. App. 180, that a contract may be proved by facts and circumstances. There must, however, be such facts and circumstances in evidence as justify the inference that the minds of the parties met upon the subject-matter of the contract.

We conclude, that there is no fact or circumstances in evidence occurring in the negotiations immediately preceding the sale, the most cogent of which is set out above, from which it can be concluded that a contract was made between the plaintiff and the respondent whereby the respondent was to receive the rent in consideration of bidding the full amount of the debt.

There is no doubt but what the respondent made the bid, under the assumption that the rent came to it. However, it takes at least

two to make a contract and the events detailed in evidence, as occurring immediately before the sale, do not bear out the inference that the plaintiff so agreed.

The question arises, as to whether any other facts or circumstances in evidence justify an inference that the plaintiff was a party to any such contract. We have set forth very fully the testimony concerning negotiations prior to the foreclosure proceedings. Considering this conversation in the light of the time the same occurred, we cannot see that any fact or circumstance bears out the inference that rent was to be given in consideration of the bid. In that conversation the witness testifies as follows: "I can't give you the time, but there was never anything specific as to bidding it in for full amount. He asked us to do that, and we bid it in for full amount."

From the evidence, it is clearly shown that this early conversation arose from the fact that the plaintiff had been attempting to collect before due, and that the witness knowing that the rent was assigned as security to the company considered on the then *status* that it was the property of the company and if then collected would all go to the company to be applied on the debt. The evidence discloses that the $200 thereafter collected and before the foreclosure proceedings was so applied.

We see nothing in these former negotiations that should change the court's earlier conclusion that there was nothing in the evidence that would bind the respondent to bid the full amount of the debt. We conclude, that there is nothing in this evidence from which it can be inferred that the respondent was bound to bid the full amount of the debt. If the respondent, on the day of the sale, had bid but half of the debt and bought the farm there is certainly nothing shown herein that would be a defense in an action against the plaintiff for the balance due.

We now give consideration to evidence of what happened after the sale.

Both the plaintiff and witness Sisson testify as to a conversation about the rent that occurred shortly after the sale. Mr. Sisson testified as follows:

"Q. Now, Mr. Sisson, when did the question of Mr. Costello's claim for these rents first come up, so far as you know? A. It was either the next day or the second day after the sale he appeared in the office and wished to know what was my understanding about the rents.

"Q. What did you tell him? A. I told him the rents were coming to the company.

"COUNSEL FOR INTERPLEADER: It is immaterial what was said at that time after the sale.

"THE COURT: Well, there is some controversy, but it is all right."

To which action of the court in overruling said objection, the plaintiff then and there at the time excepted, and still excepts.

"Q. What else was said in that conversation? A. Well, an argument kind of started about it, and I refused to argue anymore."

The plaintiff testifies as follows:

"Q. What was said about the rent? How did the conversation come up? A. He says, 'I understand you are trying to collect that rent out there.'

"Q. Do you know where he got any idea you were trying to collect the rent? A. I didn't ask him."

The respondent, of course, is entitled to the most favorable inference that this conversation justifies. The respondent makes its claim as based upon an alleged agreement had before the sale. However, the conversation may have arisen we conclude that there is therein nothing from which such a contract as contended for by the respondent can be inferred.

The respondent in its brief uses this language:

"That it was inequitable for him to permit the respondent company to bid the full amount of its indebtedness at the foreclosure sale with any secret intention on his part of subsequently claiming the rents, when he knew or must have known that said bid was being made by the insurance company with the understanding that it was to receive the rents."

Equity follows the law. The respondent based its right to rent money on an alleged express agreement with the appellant. From the evidence offered by the respondent there is nothing therein from which an inference can be drawn that there was any such contract as it claims.

Concluding, as we do, that there is no evidence to support the judgment, we know of no principle of equity that would justify us in upholding the judgment.

The judgment is, therefore, reversed and remanded with instruction to enter up judgment for respondent. All concur.